# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| KIM PATTERSON,<br><br>    Plaintiff,<br><br>  v.<br><br>UNIVERSITY OF ALASKA, ANCHORAGE,<br><br>    Defendant. | Case No. 3:14-cv-00111 RRB<br><br>**ORDER GRANTING MOTION<br>FOR SUMMARY JUDGMENT<br>AT DOCKET 11** |

      Plaintiff, Dr. Kim Patterson, is currently employed by the University of Alaska, Anchorage ("the University") as its Director of Student Support Services. He asserts two claims against the University under Title VII of the Civil Rights Act of 1964: (1) failure to promote him because of his race, African-American; and (2) retaliation for opposing unlawful discrimination. Defendant, the University of Alaska, argues that based on the undisputed facts and the applicable law, both claims should be dismissed. Docket 11.

## I. FACTUAL BACKGROUND

      Dr. Patterson began working for the University as the Director of Student Support Services, an administrative position, in 2005. Dr. Lacy Karpilo, a Hispanic woman who ultimately received the position Dr. Patterson seeks, began working at the University as the Director of Residence Life in 2009. Docket 15 at 1. In late 2012, the University President approved creation of a new Associate

ORDER GRANTING SUMMARY JUDGMENT - 1
3:14-cv-00111-RRB

Vice Chancellor position in the Student Affairs division. A search committee was formed, including the Interim Executive Director of Academic and Multicultural Student Services, Theresa Lyons, who was Dr. Patterson's direct supervisor from 2012-2014. Lyons, an African-American woman, was also appointed as chair of the committee. Docket 11 at 9-10. Fifteen candidates applied for the position, and seven of those candidates met the minimum qualifications at stage one of the process, including Dr. Patterson.

At stage two of the process, each committee member independently reviewed the seven applications and scored the applicants using a scoring rubric. Dr. Patterson's score ranked him fifth out of the seven candidates. Docket 11 at 11. Dr. Lacy Karpilo, then working as Director of Residence of UAA, earned the highest average score by nearly ten points. Docket 11 at 12. Six applicants moved on to the next stage, including Dr. Patterson.

At stage three, the search committee prepared nine Skype interview questions to ask each of the top six candidates. Two applicants, Dr. Karpilo and Dr. Laurel Hummel, advanced to the fourth stage - on campus interviews. Evidence indicates that Dr. Karpilo and Dr. Hummel scored very highly with the committee, while Dr. Patterson's evaluation yielded significant weaknesses, including that his responses to questions were not as in-depth as other candidates, and he asked only one question during his interview. Theresa Lyons, Dr. Patterson's African-American supervisor, stated that the committee did not feel Dr. Patterson had the breadth of experience that the other candidates possessed. Docket 12, Lyons Aff. ¶ 10.

Dr. Patterson's description of the facts of this case includes additional allegations of "behind-the-scenes" activities which he suggests influenced the hiring decision. Docket 15 at 3-12. He

alleges that around the same time the new position was announced, Dr. Karpilo was given a "temporary assignment outside her usual job duties," working as a "Lead Investigator" in Student Access, Advising, and Transition Division Development. Docket 15 at 3-4. As a result, Dr. Karpilo was the recipient of emails and information associated with the new position for which she and Dr. Patterson had both applied. Dr. Patterson notes that when Dr. Schultz, the Vice Chancellor of Student Affairs, began recruiting people to serve on the search committee for the position, he specifically mentioned Dr. Karpilo's qualifications to some of those individuals. Due to the nature of Dr. Karpilo's current position, she also had reason to be in touch with certain committee members outside of the hiring process.

Dr. Patterson complains that when Dr. Schultz sent the selection committee the charge memorandum, "he altered one of the key requirements that had been listed on the internet job posting." Dr. Patterson does not articulate what changes were made to the job posting, but it appears from the exhibits that Dr. Schultz may have added requirements to the job posting which closely align with Dr. Karpilo's expertise. Dr. Patterson does not, however, argue that those changes were detrimental to his own candidacy for the position.

Dr. Patterson further complains that during the search period, Dr. Karpilo had "several critical interactions" significant to this case. Docket 15 at 8. Specifically, Dr. Karpilo submitted a report to Dr. Schultz including a five-page outline of how the Division of Student Access, Advising, and Transition should operate. Additionally, another member of the selection committee sent a thirty-four page report to Dr. Karpilo including information about a "first year experience program at another institute," which that committee member thought Dr. Karpilo "might enjoy." Docket 15

at 8. Dr. Patterson takes issue with Dr. Karpilo's contacts with committee members. Defendant maintains, however, that Dr. Karpilo's correspondence with committee members was in the context of her ongoing position with the University, and that she was simply doing her job. Docket 22 at 9. And none of the complaints or concerns mentioned above suggest any form of racial animus.

Dr. Patterson also notes that at one point, select committee members discussed their scores and decided to change their scores regarding applicant Dr. Hummel, who was ultimately one of the two finalists. It is unclear what relevance Dr. Patterson thinks this has, as Dr. Hummel and Dr. Patterson, as well as Dr. Karpilo, all advanced to the next stage of interviews after those scores were changed.

Finally, Dr. Patterson complains that the Skype interviews which followed in Stage 3 were not adequately preserved for review, although attempts to record them were made. Docket 15 at 9. Furthermore, although Teresa Lyons provided a breakdown of the strengths and weaknesses of the candidates interviewed via Skype, she did not provide any objective scoring matrix to justify why only Drs. Karpilo and Hummel proceeded to the final stage. Docket 15 at 10.

Dr. Schultz ultimately interviewed the top two candidates and selected Dr. Karpilo for the position. Docket 11 at 15. Under the protocol followed, Dr. Schultz made his final selection from the top two candidates selected by the search committee, but had no vote as to who those candidates might be. Upon learning of the selection of Dr. Karpilo, Dr. Patterson chose to pursue a complaint before the Equal Employment Opportunity Commission. Docket 11 at 16. He filed a race discrimination complaint with the EEOC, which made no mention of any unlawful retaliation. Docket 11, Exhibit 28. Meanwhile, Dr. Patterson continued to work under Theresa Lyons. Docket

11 at 17. The EEOC ultimately concluded that there were insufficient facts to establish any civil rights violation and issued a right-to-sue letter. *Id.*

Dr. Patterson next filed a Complaint in state court, alleging his two claims under Title VII. Based on the federal civil rights claims, the University removed the action to federal court. The University now moves for summary judgment on both of Dr. Patterson's claims. Docket 11. The University argues that the evidence irrefutably shows that it followed a fair and comprehensive search process that culminated in a nondiscriminatory decision to hire a diverse candidate who was more qualified than Dr. Patterson.

## II. **STANDARD OF REVIEW**

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of proof for showing that no fact is in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets that burden, then it falls upon the non-moving party to refute with facts that would indicate a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Summary judgment is appropriate if the facts and allegations presented by a party are merely colorable, or are not significantly probative. *Id. See also, In re Lewis*, 97 F.3d 1182, 1187 (9th Cir. 1996); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1995).

## III. DISCUSSION

### A. Retaliation

Dr. Patterson contends in his Complaint that the University retaliated against him after he questioned the Dr. Schultz's hiring decision. The anti-retaliation provision of Title VII forbids employers from discriminating against employees because they "opposed any practice made unlawful by Title VII" or "made a charge, testified, assisted or participated in a Title VII proceeding or investigation." 42 U.S.C. § 2000e-3(a)(2010). Dr. Patterson's Amended Complaint does not articulate the nature of any retaliation. Docket 1-1. Nor is it apparent from any of the papers filed herein.

The University argues that this claim is subject to dismissal because Dr. Patterson has not exhausted this claim by filing a complaint with the Equal Employment Opportunity Commission. Dr. Patterson made no response to this argument in his Opposition at Docket 15. Accordingly, the Court finds that his Retaliation claim is dismissed for failure to exhaust administrative remedies.

### B. Employment Discrimination/Unlawful Failure to Promote

Dr. Patterson alleges that "despite being the most qualified and most experienced applicant for the job," the University selected "a less qualified applicant for the Associate Vice Chancellor position." Docket 1-1 at 4. He alleges that the reason he was not promoted was due to "disparate treatment against him based on his race." *Id.*

The *prima facie* case for a disparate treatment claim requires that a plaintiff: (1) belonged to a protected class; (2) was qualified for the job; (3) was subject to an adverse employment action; and (4) show that similarly situated employees not in the protected class received more favorable

treatment. *Moran v. Selig*, 447 F.3d 748, 753 (9th Cir. 2006). If a *prima facie* case is shown, the burden shifts to the employer to show a non-discriminatory reason for the action. If successful, the burden shifts back to the employee to show that such non-discriminatory reason was merely pretext. *Coghlan v. American Seafoods Co., LLC.,* 413 F.3d 1090, 1094 (9th Cir. 2005). "[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m).

Defendant argues that even assuming Dr. Patterson can meet his initial burden to establish a *prima facie* case, his failure to promote claim cannot succeed because (1) the University meets its burden to show that it hired Dr. Karpilo over Dr. Patterson for the position for legitimate and nondiscriminatory reasons; and (2) Dr. Patterson cannot meet the burden of showing that the University's proffered reasons are a mere pretext for discrimination. Docket 11 at 21.

In response, Dr. Patterson argues that the University's nondiscriminatory reasons for hiring Dr. Karpilo are not credible, and suggests that he should be permitted to plead his case to a trier of fact. Docket 15 at 2. A plaintiff can prove pretext in two ways: "(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Raad v. Fairbanks North Star Borough School Dist.*, 323 F.3d 1185, 1194 (9th Cir. 2003)(internal citations omitted). Dr. Patterson argues that objectively his qualifications were superior to Dr. Karpilo's, and that the evidence that the University gives to support its position that the selection process was fair "is simply riddled with disputable inferences." Docket 15 at 2.

The Court understands that Dr. Patterson asserts that the selection process was weighted to favor Dr. Karpilo, and that Dr. Karpilo was given some "unfair" advantage in the selection process by having existing relationships with certain committee members. However, even if true, Dr. Patterson has not presented any evidence to support his allegation that the *reason* Dr. Karpilo was given any advantage she *might have had* was to allow Dr. Schultz to have "his light-skinned, female friend receive a valuable position within the University," *instead of an African-American*. Docket 15 at 15. There is absolutely no support in the record for Dr. Patterson's allegation that "Dr Schultz's preselection of a light-skinned female can arguably be based on his desire to ensure that an African-American male, such as Dr. Patterson, would not have the opportunity to advance beyond his directorship position." *Id.* Furthermore, any preexisting relationships that Dr. Karpilo may have had with hiring committee members were due to her legitimate position with the University. Moreover, it is arguable that Dr. Patterson had a similar inside track, given that his direct supervisor, Theresa Lyons, who interacted with him regularly, was the chair of the hiring committee and is also African-American. Given this fact, combined with her exceptional evaluation scores, Dr Karpilo could likely have made similar arguments had she not been selected for the position.

To support Dr. Patterson's argument that he had superior qualifications to Dr. Karpilo, Dr. Patterson notes only that he received his doctorate four years prior to Dr. Karpilo, and also that he began working at UAA four years prior to Dr. Karpilo. Beyond this four year difference, Dr. Patterson has failed to identify the nature of his alleged superior qualifications. *See* Docket 15. In *Blue v. Widnall,* the Ninth Circuit addressed a similar employment discrimination scenario where the plaintiff argued that his qualifications were so superior to the selectee's qualifications that a

rational trier of fact could find discriminatory intent. 162 F.3d 541, 547 (9th Cir. 1998). In *Blue,* it was the interview scoring which was relevant, and the Court found that the plaintiff and the selectee were scored almost identically twice prior to the interview based on their qualifications. *Id.* Here, Dr. Karpilo scored dramatically *higher* than Dr. Patterson in the interview process. The asserted superior qualifications did not raise a genuine issue of fact of pretext in *Blue*, and the same is true in the case of Dr. Patterson.

Similarly, the use of subjective factors (i.e., the interview process) to evaluate applicants is not illegal per se, although it may be used as a covert means to effect intentional discrimination. *Id.* However, Dr. Patterson – like the Plaintiff in *Blue* – offers no evidence that the interview process was used to mask discriminatory motives. Once again, he merely asserts that his qualifications were so superior that the use of the interview process shows pretext. Dr. Patterson simply fails to present sufficient evidence of pretext so that a rational trier of fact could find discriminatory intent. *Id.*

Finally, Dr. Patterson complains that the University failed to preserve recordings of the Skype interviews. The University explains that although two sets of recordings of the Skype interviews were attempted, one set of records was "not digital, [and therefore] they could not be shared easily and were never reviewed in the course of the selection committee's deliberation. The recordings were subsequently deleted. Theresa Lyons also attempted to record some of the interviews on her iPhone." Docket 22 at 10-11. Apparently Lyons had forgotten about those records until later in the discovery process, but they have since been produced to the Plaintiff. *Id.* Dr. Patterson argues that the Skype records were "vital information that he needed to determine whether disparate treatment had occurred during stage three of the interview process." Docket 15 at 21. Dr. Patterson argues

that failure to retain the Skype interviews has "robbed [him] of the opportunity to compare the questions asked each candidate." *Id.* However, as the University points out, the facts surrounding the Skype interviews can be adequately explored through other evidence, including the list of interview questions approved by Human Resources, the iPhone recordings, affidavits and depositions of members of the search committee, and contemporaneous handwritten notes documenting candidate responses to interview questions. Docket 22 at 12-13. "When a proponent cannot produce original evidence of a fact because of the inadvertent loss of the evidence, proof by secondary evidence is permissible." *Medical Laboratory Management Consultants v. American Broadcasting Companies, Inc.,* 306 F.3d 806, 825 (9th Cir. 2002). Furthermore, when a party "has produced no evidence—or utterly inadequate evidence—in support of a given claim . . .the destruction of evidence, standing alone, is [not] enough to allow [the] party ... to survive summary judgment on that claim." *Id.* (citing *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir.1998)). "In borderline cases, an inference of spoliation, in combination with 'some (not insubstantial) evidence' for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment." *Id.* (citing *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir.2001)). The Court is unpersuaded that there might be some "smoking gun" evidence of race-based discrimination in any missing video records of the actual interviews, and Dr. Patterson has not alleged any such suspicions. Rather, he only wishes to verify the questions asked of each candidate - which can be verified by other means. Finally, Dr. Patterson has produced no evidence in support of his claim. The inadvertent destruction of the video recordings - standing alone - is therefore not enough to allow Dr. Patterson to survive

summary judgment. This is particularly true in this case, where the iPhone recordings have since been discovered and produced.

## IV. **CONCLUSION**

Even if Dr. Karpilo was "preselected" for the position, which does not appear to be the case, "only preselection based on discriminatory motives violates Title VII." *Blue v. Widnall,* 162 F.3d at 547. Dr. Patterson "has not presented evidence that any preselection resulted from a discriminatory motive instead of political considerations." *Id.* Moreover, Dr. Patterson has not articulated how he was more qualified for the position eventually awarded to Dr. Karpilo. Regardless, Title VII does not ensure the best will be selected—only that the selection process will be free from impermissible discrimination. *Casillas v. U.S. Navy*, 735 F.2d 338, 344 (9th Cir. 1984).

> We have explicitly rejected the idea that an employer's use of subjective employment criteria has a talismanic significance: "Even assuming subjectivity was involved here, it has never been held that subjective evaluation by an employer is per se prohibited by Title VII, or alone shifts to the defendant the burden of proving absence of intentional ... bias ...." . . . Title VII is the law's promise that employment decisions will not be based on non-permissible discriminatory criteria, not that subjective criteria will be eliminated. [Plaintiff] cannot render sound business judgment illegal by labeling it "subjective." Many criteria for higher level jobs are not easily articulable, and their conversion to writing does little to stop employers who desire to discriminate.

*Id.* at 345 (internal citation omitted). A plaintiff can combine proof of reliance on subjective criteria with other evidence to show pretext, holding that "[a]n employer's use of subjective criteria is to be considered by the trial court with the other facts and circumstances of the case." *Id.* at 345. But in this case, Dr. Patterson offers nothing additional to support his allegation that the selection of Dr. Karpilo was racially discriminatory. On the contrary, the University appears to have gone to

great lengths to insure a fair and open and non-discriminatory selection process. Accordingly, The University's Motion for Summary Judgment at **Docket 11** is **GRANTED** and this matter is **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED** this 11th day of August, 2015.

S/RALPH R. BEISTLINE
UNITED STATES DISTRICT JUDGE